SOUTH CAROLINA ELECTRIC & GAS
COMPANY, Petitioner,

v.

FEDERAL POWER COMMISSION,
Respondent.

United States, on behalf of the Secretary
of the Interior, Intervenor.

No. 9091.

United States Court of Appeals
Fourth Circuit.

Argued June 19, 1964.

Decided Nov. 9, 1964.

Harry A. Poth, Jr., Washington, D. C. (Robert C. Woodbury, New York City, Peyton G. Bowman, III, and Reid & Priest, Washington, D. C., and Arthur M. Williams, Jr., Columbia, S. C., on brief), for petitioner.

Paul A. Sweeney, Atty., F.P.C. (Richard A. Solomon, Gen. Counsel, Howard E. Wahrenbrock, Sol., Thomas M. Debevoise, Asst. Gen. Counsel, and Joseph B. Hobbs, Atty., F.P.C., on brief), for respondent.

Edward Berlin, Atty., Dept. of Justice (John W. Douglas, Asst. Atty. Gen., and Sherman L. Cohn, Atty., Dept. of Justice, on brief), for intervenor.

Before BRYAN and BELL, Circuit Judges, and HEMPHILL, District Judge.

ALBERT V. BRYAN, Circuit Judge:

The Federal Power Commission has assessed the South Carolina Electric & Gas Company, under § 10(f) of the Federal Power Act,[1] for benefits to its hydroelectric plant on the Savannah River in Georgia and South Carolina accruing from the erection by the Government of an upstream dam and reservoir. Petitioning[2] us to review and set aside the order, the Company asserts that it is not subject to the Act; that even if assessable, it is entitled to substantial, unallowed credits; but that, in any event, the levy is inequitable and without evidential basis. An additional assessment for the determination-cost (investigative expense) is attacked as legally unwarranted. The Secretary of Interior intervened to defend the interests of the United States. We decline to disturb the determination of the Commission.

The Act, as invoked, reads as follows:

"10(f) That whenever any licensee hereunder is directly benefited by the construction work of another licensee, a permittee, or of the United States of a storage reservoir or other headwater improvement, the Commission shall require as a condition of the license that the licensee so benefited shall reimburse the owner of such reservoir or other improvements for such part of the annual charges for interest, maintenance, and depreciation thereon as the Commission may deem equitable. The proportion of such charges to be paid by any licensee shall be determined by the Commission. The licensees or permittees affected shall pay to the United States the cost of making such determination as fixed by the Commission.

"Whenever such reservoir or other improvement is constructed by the United States the Commission shall assess similar charges against any licensee directly benefited thereby, and any amount so assessed shall be paid into the Treasury of the United States, to be reserved and appropriated as a part of the special fund for headwater improvements as provided in section 17 hereof [16 U.S.C. § 810].

"Whenever any power project not under license is benefited by the construction work of a licensee or permittee, the United States or any agency thereof, the Commission, after notice to the owner or owners of such unlicensed project, shall determine and fix a reasonable and equitable annual charge to be paid to the licensee or permittee on account of such benefits, or to the United States if it be the owner of such headwater improvement."

The Company's project, Stevens Creek plant, derives its name from a river tributary just above it. Constructed in 1913–14 the dam is a little more than 8 miles upstream of Augusta, Georgia. Besides the reservoir, there are power generating facilities with a total capacity of about 18,000 kilowatts. Authority for its operation stems from a permit issued on July 20, 1910, amended in 1912 and 1913, by the Secretary of War.

The Government's installation, a much larger project, is known as Clark Hill. Consisting of a dam, reservoir and power generating machinery located 13 miles above Stevens Creek and 21 miles from Augusta, it was authorized by the Flood Control Act of 1944, 58 Stat. 887, for a threefold purpose: to provide flood con-

---

1. Federal Power Act, Federal Water Power er Act of June 10, 1920, 41 Stat. 1063, 1070, as subsequently amended, including amendments and change of name by Title II of the Public Utility Act of 1935, 49 Stat. 838, 843–844, 16 U.S.C. §§ 791a, 803(f).

2. Section 313, 16 U.S.C. § 825l(b).

trol, maintain river navigability (navigation) and generate electric energy.

Augusta also owns and operates a dam on the Savannah above the city a mile below Stevens Creek, the catchment also being utilized in power production.

A headwater improvement can increase the energy production of a lower-stream project by accumulating a storage at high-water times and making it available during reduced river flow. The present assessment amounts to $148,545, independently of the determination-cost of $10,000, for such benefits redounding to Stevens Creek in the period of October 12, 1953 through December 1955. While closure of the Government dam was completed in August 1950, there was a net loss in generation at Stevens Creek in 1952 due to the first filling of the pound. Accordingly, the headwater benefit assessments run from October, 1953, at which time the energy gains had offset the losses.

Subject to its primary defense—denial of the reach of the Act—energy gains due to Clark Hill are conceded by the Company, but it seeks two specific deductions from the charges and questions the reasonableness of the assessment. First, the Company seeks recoupment of the value of the assistance rendered by Stevens Creek through reregulation of the waters discharged from Clark Hill. This contribution comprises stabilization of the sporadic releases from Clark Hill and so provides compensation water as it may be required to maintain the river's navigability. In the absence of Stevens Creek, structures to complement Clark Hill in this function would have to be built by the Government.

Secondly, the Company asks a deduction for injury from Clark Hill's alleged curtailment of the "dependable capacity" of Stevens Creek. That term, when applied to a hydroelectric enterprise, means "its load-carrying ability at the time of the annual system peak load, assuming a recurrence of the most adverse stream flow conditions of record".

Finally, the attack on the assessment as a whole consists of allegations of the want of substantial supporting evidence, and the use of unacceptable factors in computation.

I. The Company asserts primarily that it is untouched by the Federal Water Power Act, now the Federal Power Act (the Act), because it was not passed until 1920, and not amended even purportedly to affect Stevens Creek until 1935, while the permit of the Company's predecessors, and now its own, was issued on July 20, 1910. The permit stems from the General Dam Act of June 21, 1906, 34 Stat. 386, controlling the construction of dams across navigable waters, and from a special Act of Congress approved August 5, 1909, 36 Stat. 180, particularly, granting the permit to the Company's assignors. The Act, the Company concludes, could not thus burden the prior permit by authorizing an assessment because that would constitute an unconstitutional deprivation of vested rights—a taking without due process.

The answer to this argument is that there is no such constitutional question presented. The permit was granted and accepted subject to future obligations. Since the Company's original assent to later impositions now bars its complaint, we need not consider whether vested rights may ever be acquired in a navigable waterway. Cf. United States v. Grand River Authority, 363 U.S. 229, 231, 80 S.Ct. 1134, 4 L.Ed.2d 1186 (1960).

The enabling legislation discloses that the right to place upon the permittee additional burdens, or otherwise modify the previous authorization, was reserved by the Government ab ovo. The underlying statute, the General Dam Act of June 21, 1906, supra, 34 Stat. 386, expressly retained for Congress the right to alter, amend or repeal it, simultaneously stipulating that the United States should not incur liability to any dam owner for such modification.

The permit, issued as noted under the Act of August 5, 1909, supra, 36 Stat.

180, and providing a term of 50 years, authorized construction "in accordance with the provisions of" the General Dam Act. Because of the reservation in that Act, the permit was amenable to the Act's amendment on June 23, 1910, 36 Stat. 593. The latter declared:

> "That the Chief of Engineers and the Secretary of War are hereby authorized and directed to fix and collect just and proper charge or charges for the privilege granted to all dams authorized and constructed under the provisions of this Act which shall receive any direct benefit from the construction, operation, and maintenance by the United States of storage reservoirs at the headwaters of any navigable streams. * * *"

Furthermore, the permit itself notes in Condition 7 that the Secretary of War "may fix and collect just and proper charges should any direct benefit be received by said Company from the construction, operation and maintenance by the United States of storage reservoirs, at the headwaters of said Savannah River. * * *"

At this point it is well to recall that the levy upon the Company pursuant to the Act was not retrospective. Charges were assessed in futuro, that is from the time of the Act's enactment in 1920 as to licensees, and, after its 1935 amendment, in regard to permittees. With respect to Stevens Creek the assessment was laid only for years within the last eight years of its permit. In sum, we see no basis whatever for the Company's accusation of infringement, unconstitutional or otherwise, through the assessment directed by the Federal Power Act and its 1935 amendment.

II. Nor can we concur in the Company's contention that, the constitutional question aside, the Act by its terms does not include Stevens Creek. The argument is that when passed in 1920, it was applicable only to licensees, that Stevens Creek has never been a licensee but al-ways a permittee, and hence it was not within the statute. In addition, the Company stresses, § 23 of the Act provided that " * * * this Act shall not be construed as affecting any permit or * * * any authority heretofore given pursuant to law."

While owning that in 1935 the Act was amended to comprehend permittees, the Company accents that the proviso of § 23 just quoted was therein re-enacted and thus retained after the 1935 amendment. From this it is argued that Congress did not intend to enlarge the obligations of the Stevens Creek permit, certainly not so "affecting" it as does the present assessment.

■ In our opinion the saving clause does not exempt Stevens Creek. The permit originally admitted the Government's right to assess reasonable charges, and so the exercise of that retained power was merely a step altogether congruent and in keeping with the permit. Hence it was left unaffected, just as the proviso insists.

■ Nevertheless, continues the Company, the word "permittee" as used in the 1935 amendment refers only to an upstream permit holder who by construction work has benefited a lower licensee. Therefore, in authorizing assessments for benefits and costs against a permittee, the amendment could not have included a downstream permittee, such as Stevens Creek. This stiff construction we reject. The postils upon the amendment in its passage through Congress quite unsecretly demonstrate that the enactment was aimed at all unlicensed plants. To uphold the Company's argument on this head would be to undo the amendment entirely, and preserve the discrimination theretofore favoring the unlicensed dams—trespassers and permittees alike—over the licensed.

■ Likewise we are unconvinced by the Company's assertion that the Commission is given no jurisdiction to make

the assessment inasmuch as it did not issue the permit. Section 4 of the Act, 16, U.S.C. § 797, endowed the Commission with plenary surveillance of both permittees and licensees without reference to their origin. While there is no express transfer of authority from the Secretary of War or the Chief of Engineers to the Commission to regulate the permittees, the Act at least gave the Commission concurrent authority to do so. Again, the 1935 amendment explicitly directed and empowered the Commission, and no one else, to make the assessment. With amendatory powers so plainly retained, the right of Congress to change the supervision of the Company's privileges and obligations and place it under the Commission is beyond question.

█ III. Moreover, Stevens Creek's reregulation of Clark Hill's discharges, did not beget a claim upon the United States. Under the organic statutes, taken cum onere by the Company, the Government's utilization of the by-service of Stevens Creek was not poaching. Adoption of the Company's pond as an appurtenance to Clark Hill was entirely rightful under the General Dam Act and the 1910 Amendment. These enactments allowed the Chief of Engineers and the Secretary of War, in approving the plans for a dam, to insert such conditions and stipulations as were "necessary to protect the present and future interests of the United States", including the erection at the expense of the Company of "structures for navigation purposes". This stipulation was expressly carried into the permit, by the amendment of November 16, 1912, as Condition 3, reading:

> "3. * * * That at any time in the future, if the interests of navigation shall require it, such additions to or alterations in the structure as may be prescribed by the Secretary of War shall be promptly made without expense to the United States."

Obviously, the call on the Stevens Creek reservoired waters is but a slight invocation of the Government's rights. If under the permit the Government could require a structure to be installed for reregulation to promote navigation, it could exact the lesser provision—the joint use of a pond already existing.

The Company realizes that, even if there were a cognizable claim for reregulation, it could not recover for any amount above the assessment, in face of the suit-immunity of the Government. Alternatively, the plea is that in fixing reasonable and equitable charges, under § 10(f) of the Act, the Commission temper them with the value of the services of Stevens Creek to Clark Hill. The credit is allowable as recoupment, the Company presses, even to the point of squaring off the assessment.

█ True, the assessment of the monetary value of what Stevens Creek has been the beneficiary must be measured equitably—"a reasonable and equitable annual charge" * * * "for such part of the annual charges for interest, maintenance, and depreciation [on Clark Hill] * * *" as is "equitable". But this means only that the proportion of the annual charges of Clark Hill and the ratable share thereof assignable to Stevens Creek shall be determined equitably. This entrustment does not qualify the Commission to consider the justice of an assessment in favor of Stevens Creek or indeed even to segregate and evaluate any such feature. The equities favoring Stevens Creek do not enter into the calculation of the statutory benefits. Stevens Creek's enhancement of Clark Hill is a consideration ultra vires the Commission in the execution of § 10(f) directives.

█ As we have seen, the reregulation claim has no basis in contract or law. We say further that it has no greater stature in equity. Its help to Clark Hill causes Stevens Creek no extra expenditure. In furnishing this supplement to Clark Hill, Stevens Creek is simply sur-

rendering that which laid both in render and in prender to the Government. Stevens Creek is not a donor or a benefactor; it is a debtor and an obligor. Denial of accreditation is not rested upon the principle of damnum absque injuria, but on a recognition of a right paramount. There is no equity of recoupment.

■ On the other hand, the Company's second claim—diminution of Stevens Creek's dependable capacity—does have assertable standing. It would be a decrement in Clark Hill's bounty, for it would impair the utility of the very impoundage augmented by Clark Hill. Such an injury has been suffered, the Company complains, because the unscheduled releases from Clark Hill prevent the maintenance by Stevens Creek of regular and adequate storage to meet its own peak demands. As a result it cannot operate constantly at full capacity —18,000 kw.

But this claim has been settled against the Company factually, for the Commission has found there was no impairment. The Secretary of Interior and the Commission Staff contended, from the power reports of the Company and other evidence, that Stevens Creek's dependable capacity had never been more than 5,000 kw. The Secretary contended, more, that Clark Hill had expanded Stevens Creek's capacity. The Commission followed the report of the Staff, finding neither gain nor loss.

IV. The assessment of benefits is unfair, also avers petitioner, because not within the demands of § 10(f) for reasonableness and equitableness. The Commission came to its figure by: (A) ascertaining the quantum in kilowatt hours of the benefits that Stevens Creek derived from Clark Hill, (B) appraising the monetary value of this gain, (C) computing the interest, maintenance and depreciation costs of Clark Hill in the production of power only, and (D) by finding the proportion of such costs to be borne by Stevens Creek on account of its gains.

A. "Benefits" as used in § 10(f) here means energy gains, that is the increase of production at Stevens Creek traceable to Clark Hill. That there was such a gain is a concessum. It is the increment of generation at Stevens Creek with— over that without—Clark Hill. The difficulty of appraising the production creditable to Stevens Creek's sole resources while working in conjunction with Clark Hill was solved by applying during that period the previous ratio of Stevens Creek generation to "usable" streamflow. Streamflow was estimated by reference to available data from 1939 to 1949 and from the records of the Clark Hill discharges for 1950–1955. Generation by Stevens Creek for the entire time was known.

The ratio of streamflow to energy produced in those years—1939 to 1949—was applied to streamflow in 1950–1955 to establish what would have been the production of Stevens Creek during that span—if Clark Hill had not been in existence. The result was deducted from actual energy production at Stevens Creek for 1950–1955. The remainder showed the approximate energy gains attributable to Clark Hill. The Staff found a gain of 49,010,000 kw-h; the Secretary 46,075,000; and the Company 39,491,000. The Examiner adopted the Staff's figure but reduced it for evaporation losses at Clark Hill.

In this calculation the Company complains that the Examiner, with the subsequent approval of the Commission, misconstrued Special Condition 5 of the permit. That provision, as later modified, prohibits the *storage* of water in Stevens Creek whenever the river flow near Augusta is less than 6,550 cubic feet per second. The Company contends that the Examiner employed this condition as a prohibition on the *release* of water by Stevens Creek. However, the Examiner was well aware of the meaning of the condition, and we cannot say he misapplied it, or that a misapplication of it controlled his conclusion, in view of the

other factors he recites as leading to his final determination.

B. The Examiner fixed the monetary worth of the increased energy gains at $170,198. The Commission overruled his evaporation concession and on that account adjusted the value figure to $177,278. In computation the factor used was the resulting saving by the Company in the operation of its steam electric-generating plants. In this, allowance was made for the additional transmission costs from Stevens Creek.

C. Next, the Examiner explored the operational costs—interest, maintenance and depreciation—at Clark Hill. From the total investment of the Government in Clark Hill, it sequestered these three items with reference to the facilities used jointly for the triple functions of Clark Hill: flood control, navigation and production of power. Deducted from this result were the expenses allocable to flood control and navigation, and the residue then allotted to power. This amounted to $3,263,318.

D. Of this amount the Examiner charged $141,465 to Stevens Creek. The Commission raised this to $148,545—$7080 restored for evaporation—which is about 83% of the value fixed for Stevens Creek's benefits from Clark Hill.

The apportionment was effectuated by the application of these factors: (1) the value in dollars of the service at Clark Hill; (2) the value in dollars of the service to Stevens Creek; and (3) the sum in dollars of the power-interest, -maintenance and -depreciation at Clark Hill. So much of the aggregate power costs of Clark Hill—$3,263,318—was attributed to Stevens Creek and Clark Hill, respectively, as the value of service of each of them bore to the total of the service value to them.

The Company complains that in this separation the Commission applied what is known as the value of service instead of the cost of service rule. Here, cost of service refers to the unit cost of energy production at Clark Hill, and value-of-service refers to the unit value of the energy to Stevens Creek at its plant. The Company argues the two are unrelated and so should not be intermixed in apportioning the costs at Clark Hill. But the premise is not entirely correct.

In the first place, generally the two rates of charge do have a common denominator, in that both are values of service. The value of service to Clark Hill is the sale price there of the energy and this by law must closely approach the cost of production at Clark Hill. Flood Control Act of 1944, supra, 58 Stat. 887, 890.

The Stevens Creek unit is the value of the service at that plant. True, this is shown to be higher than the unit of value at Clark Hill, and in this sense the units do lack fungibility. But the use of the Stevens Creek unit still seems justified because of the Act's requirement that the contribution of Stevens Creek be the value of the service to it. This value, as we have seen, is evolved from the savings to Stevens Creek in steam generation.

But even if cost-of-service might have been employed, nevertheless we have no reason to interfere with the Commission in its choosing of the value of service method. Colorado Interstate Gas Co. v. F. P. C., 324 U.S. 581, 589, 65 S.Ct. 829, 89 L.Ed. 1206 (1945). Its selection is not overborne by the initial use, ordinarily, of cost of rendering the service, along with plant cost, in fixing what should be charged by a utility for its service. See South Carolina Generating Co. v. F. P. C., 249 F.2d 755, 766 (4 Cir. 1957). Here the search is for the value to a recipient after production, rather than the cost of production.

Another attack made upon the conclusion of the Commission is that it did not give weight to Clark Hill's donation to the City of Augusta's barrage. The Examiner adopted the Staff's view "that any benefits to plants along the Augusta canal due to regulation at Clark Hill would not be substantial"; he found

also that this ascertainment would cost more than the beneficial value. This the Commission confirmed with reason.

V. lastly, the Company says it is aggrieved by its assessment with investigation expense in the sum of $10,000.00. Nothing is adduced to disprove the reasonableness of this sum, and we have no doubt of the responsibility of the Company for it. The statute declares the liability. Condition 9 of the Company's permit recognizes it:

"9. That said company shall reimburse the United States for any and all expenses to which it has been placed in connection with the proposed power development, *or which may hereafter be incurred with reference thereto, including the cost of any investigations necessary for the approval of plans* and of such supervision of construction as may be necessary in the interest of the United States." (Accent added.)

VI. Our function ends with the determination of whether or not there was substantial evidence to sustain the Commission's decisions. Save when its answers violate some legal principle, we are impotent to substitute ours for judgments of the Commission vouched by satisfying evidence. This is true of the subordinate issues it has resolved, as well as of the ultimate assessments. Federal Power Act, § 313(b), 16 U.S.C. § 825*l*(b). Where, as here, the controversy concerns matters of scientific knowledge upon which experts may disagree the rule is peculiarly a guide to the courts. United States ex rel. Chapman v. F. P. C., 191 F.2d 796, 808 (4 Cir. 1951), aff'd 345 U.S. 153, 73 S.Ct. 609, 97 L.Ed. 918 (1953); Pacific Power & Light Co. v. F. P. C., 141 F.2d 602, 605 (9 Cir. 1944). The petitioner has not demonstrated that the factual accounts stated by the Commission are without requisite backing, or that the law it has applied is exceptionable. In fine, we sustain the determinations and order of the Commission.

Petition denied.