**ALABAMA POWER COMPANY,**
Petitioner,

v.

**FEDERAL POWER COMMISSION,**
Respondent,

United States, Intervenor.

No. 24067.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 5, 1970.

Decided Sept. 24, 1971.

Mr. Thomas M. Debevoise, Washington, D. C., with whom Messrs. William J. Madden, Jr., and William M. Cohen, Washington, D. C., were on the brief, for petitioner.

Mr. Peter H. Schiff, Solicitor, Federal Power Commission, at the time the brief was filed, with whom Messrs. Gordon Gooch, General Counsel, Leonard D. Eesley, Assistant General Counsel, and Joseph J. Klovekorn, Atty., Federal Power Commission, were on the brief, for respondent. Mr. Israel Convisser, Atty., Federal Power Commissioner, also entered an appearance for respondent.

Mr. Samuel Huntington, Asst. to the Solicitor General, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of Court, with whom Mr. Robert V. Zener, Atty., Department of Justice, was on the brief, for intervenor.

Before FAHY, Senior Circuit Judge, and LEVENTHAL and ROBB, Circuit Judges.

LEVENTHAL, Circuit Judge:

This case is before us on a petition to review an order of the Federal Power Commission requiring petitioner to pay $287,867 as its share of the annual interest, depreciation, and maintenance costs, during the period 1961–63, for that portion of the federally owned Allatoona Dam which supplied headwater benefits to four downstream facilities licensed to petitioner. Petitioner does not dispute its obligations to pay some portion of the costs; its contention is that the amount assessed by the Commission was excessive. The Secretary of the Interior intervened in support of the Commission's order.[1] We affirm.

## I. GENERAL BACKGROUND

Section 10(f) of the Federal Power Act[2] applies whenever the owner of a

---

1. The Secretary has direction of the Southeastern Power Administration, 10 Fed. Reg. 1901, which markets the power produced at the federal project. The Secretary's power marketing functions are set forth in § 5 of the Flood Control Act of 1944, 16 U.S.C. § 825s.

2. 16 U.S.C. § 803(f):
   That whenever any licensee hereunder is directly benefited by the construction work

hydroelectric project licensed by the Commission is benefited by the operation of headwater improvement—for example, through the release of water by the upstream dam that can be used to generate additional power at the licensee's downstream site. It requires the Commission to order the downstream licensee to reimburse the owner of the headwater improvement "for such part of the annual charges for interest, maintenance, and depreciation thereon as the Commission may deem equitable." The costs to be allocated are those charged to the "joint-use" facilities of the upstream plant, i. e. the dam and reservoir, which contribute to the production of power both at the upstream and at the downstream projects.[3] There is no allocation under § 10(f) of the costs of the "specific power facilities" of the upstream plant—e. g., its power house and equipment—which relate solely to the generation of power at that plant, and contribute nothing to the generation of power downstream.

Petitioner Alabama Power ("Alabama") is the licensee of four hydro-

electric projects on the Coosa River in the State of Alabama—the Weiss, Lay, Mitchell, and Jordan Projects. Three of these—Lay, Mitchell, and Jordan—began operations between 1914 and 1929. They are run-of-the-river plants, having no seasonal storage capacity, and utilizing pondage flow of the stream as it reaches each project. When the federal Allatoona dam in northwest Georgia was completed in 1950, upstream of petitioner's project.[4] its substantial storage capability permitted Alabama to realize energy gains at these three downstream facilities. In a series of proceedings the Commission assessed charges for headwater benefits from the Allatoona dam for the period 1950 through 1960.[5] Alabama paid these charges without dispute.

In 1961, Alabama's Weiss Project went into operation. Located between Allatoona and the three older Alabama dams, Weiss has storage capacity and therefore can supply some of the power benefits that had previously been conferred on these facilities by Allatoona.[6] On Sep-

of another licensee, a permittee, or of the United States of a storage reservoir or other headwater improvement, the Commission shall require as a condition of the license that the licensee so benefited shall reimburse the owner of such reservoir or other improvements for such part of the annual charges for interest, maintenance, and depreciation thereon as the Commission may deem equitable. The proportion of such charges to be paid by any licensee shall be determined by the Commission. The licensees or permittees affected shall pay to the United States the cost of making such determination as fixed by the Commission.

Whenever such reservoir or other improvement is constructed by the United States the Commission shall assess similar charges against any licensee directly benefited thereby, and any amount so assessed shall be paid into the Treasury of the United States, to be reserved and appropriated as a part of the special fund for headwater improvements as provided in section 810 of this title.

    \*      \*      \*      \*      \*

3. Of the costs charged to the joint-use facilities of Allatoona, about 31% are

further charged to the flood-control rather than power-producing functions of that project. This flood-control percentage is not included in the 10(f) costs to be shared by Alabama Power.

4. The Allatoona Dam is located on the Etowah River, a tributary of the Coosa River, about 48 miles upstream from Rome, Georgia. The Weiss project is on the Coosa River, 130 miles downstream from Allatoona. Lay is about 160 miles downstream from Weiss, and Mitchell and Jordan are about 14 and 33 miles downstream from Lay, respectively.

5. 13 F.P.C. 1317 (1950–52) ; 16 F.P.C. 827 (1953–55) ; 22 F.P.C. 749 (1956–57) ; 27 F.P.C. 398 (1958–60).

6. The Weiss project was constructed under license issued by the Commission pursuant to Act of June 28, 1954, 68 Stat. 302, which permitted non-federal development of the Coosa "in accordance with the conditions of a license." Since 1963, there have been further water resource developments on the Coosa. Alabama had raised the power pool elevation of the Jordan and Lay projects seven feet and fourteen feet, respectively. It has con-

tember 28, 1966, the Commission issued its determination, without hearing, assessing Alabama $296,003 for headwater benefits provided by Allatoona to the four downstream projects during the period 1961 to 1963. 36 F.P.C. 701 (1966). Alabama applied for a hearing, which resulted in an order specifying a revised assessment of $287,867, an amount less than that proposed by the Examiner, Staff, or Interior, but higher than that envisaged by Alabama, who has taken this appeal.[7]

## II. REASONABLENESS OF THE COMMISSION'S METHODOLOGY

### A. *The Value Formula*

The parties stipulated that the allocable 10(f) costs for 1961–63 of the upstream Allatoona project totaled $1,762,732, and that the determination of what portion of this amount was to be borne by Alabama, on a determination of benefits, should be governed by the so-called Value Formula used by the FPC in prior cases as well as this one.[8] Stated simply, this formula provides for the allocation of 10(f) costs according to the comparative value of the joint-use facilities to

the downstream owner and to the production of power at the upstream plant providing the headwater benefit. In other words, if Alabama derived $300 worth of power benefits from Allatoona dam and reservoir, and these facilities had a value of $500 to the production of power at Allatoona itself, then Alabama would be charged with 3/8 of the allocable costs of the facilities. Alabama does not dispute the validity of this formula in general, but only its application in this particular case. Alabama says, in essence, that the Commission both overvalued the power benefits derived by Alabama, and undervalued the power benefits derived by the Government. We examine each of these contentions in turn.

### B. *Power Benefits Derived by Alabama*

In order to calculate the value of benefits derived by Alabama from Allatoona, the Commission first had to estimate the amount of energy gained at its downstream plants from this upstream facility.[9] In the usual case this would simply require a comparison between (1) the energy that would have been generated downstream without the upstream regulation, and (2) the energy actually

structed the H. Neely Henry, Logan Martin and Walter Bouldin hydroelectric projects. The United States has under construction the Carters development, with seasonal storage, in the headwaters of the Coosa near Rome; and has recently completed the Miller's Ferry project downstream of the Coosa on the Alabama River.

7. 42 F.P.C. 1124 (1969). The order also assessed $30,000 to cover the cost of the determination.

The following table sets forth the charges for headwater benefits (exclusive of cost of determination) that were proposed to the FPC by the participants and Examiner:

| Source | Charge |
|---|---|
| Licensee | $134,560 |
| Examiner | 332,831 |
| Staff (as revised) | 361,992 |
| Interior | 461,885 |

8. The formula is set forth and discussed in the Initial Decision of the Examiner, and also in Virginia Elec. & Power Co., 37 FPC 340, 358 (1967). It reads as follows:

$$Pn = Cp = \frac{Vn}{Vf + Vd}$$

in which Pn=annual payment to be made for headwater benefits received at a downstream non-federal plant (or group of plants),

Cp=total annual 10(f) costs of the Allatoona Dam and reservoir to be borne by power both at site and downstream,

Vn=net annual monetary value of benefits received at a downstream non-federal plant (or plants),

Vf=annual monetary value of the Federal headwater improvements to at-site power production, and

Vd=net annual monetary value of benefits received at all downstream plants. Since Alabama's are the only downstream plants involved in this case, here Vd=Vn.

9. In some cases an upstream plant will contribute two kinds of power benefits to the downstream owner—a gain in energy generated, and a gain in generation capacity. In this case the Commission, contrary to the findings of the hearing examiner, found no capacity gains to Alabama.

generated at the downstream plant with the upstream project on the river.[10] Once these gains are determined, the Commission must calculate their monetary value. This is done by comparing the incremental cost of producing the same amount of energy with alternate facilities, in this case the several steam plants in the area. The difference between these costs—i. e., the savings in the cost of generation—is the value of the joint-use facilities to the downstream plants. The Commission found this value to be $392,690 for the three-year period in question.

In this case, however, the calculation of energy gains is complicated by the fact that there are two upstream facilities—Allatoona and the Weiss project—that could contribute energy gains to the Alabama system. At the Commission hearing Alabama contended that to the extent its own Weiss facility could contribute the same power benefits as Allatoona, these benefits should not be charged to Alabama in computing its share of the 10(f) costs. Thus Alabama figured its energy gains by calculating the energy that its four downstream plants would have produced without Allatoona, and then subtracting this amount from the actual metered generation at these plants.

The Commission staff, on the other hand, pursued the opposite theory. After making a separate determination of the energy gains at Weiss, the staff sought to charge Alabama for all of the energy gains that Allatoona would have conferred on Lay, Mitchell, and Jordan if Weiss had not been on the river. It attributed to Weiss only the incremental gains accruing to these downstream dams as a result of the operation of both storage projects simultaneously.[11]

Both the Hearing Examiner and the Commission rejected Alabama's approach and adopted the staff's method for calculating benefits to Lay, Mitchell and Jordan. It was the Commission's view that Alabama's method would, in effect, "permit a project constructed downstream and later in time to discount, cancel out or allocate to itself the benefits originally provided by upstream headwater improvements." 42 F.P.C. at 1130. We think that the Commission's approach was reasonable. Petitioner argues the Commission is requiring Alabama to pay for power benefits which it itself is able to obtain through its own storage facility at Weiss. It contends that the decision violates the "direct benefit" requirement of § 10(f). That section merely says that "whenever any license hereunder is directly benefited by the construction work of another licensee, * * * the Commission shall require as a condition of the license that the licensee so benefited shall reimburse the owner" of the facility conferring the benefit "for such part of the annual charges for interest, maintenance, and depreciation thereon as the Commission may deem equitable." Once there is a

10. If on a given day the upstream project stores water, the flow at the downstream plant is reduced, allowing for travel time. If the reduced flow results in a loss of daily generation at the downstream plant, a negative energy gain results. If, on the other hand, water is released from storage upstream, the downstream flow is increased. If this leads to an increase in daily generation a positive energy gain results. The excess of positive over negative energy gains is the net gain attributable to upstream regulation.

11. To illustrate with hypothetical figures: Assume that Allatoona, operating alone, would result in a 70% increase in the monthly generation of these three plants, over natural flow; that Weiss, operating alone, would result in a 60% monthly increase; and that, operating together, Weiss and Allatoona would permit a monthly energy gain of 100% over natural flow conditions. The Commission staff's approach would credit Allatoona with 70% of this 100% gain, since that is the amount of benefit it would confer if operating alone, and attribute to Weiss only the incremental 30%. Alabama, on the other hand, would credit Allatoona with only a 40% benefit, the difference between the total power benefits conferred by both plants (100%) and the gain that its own Weiss plant would confer if operating alone (60%).

"direct benefit" in the form of power gain,—as contrasted with the "indirect benefit" of, say, market growth resulting from flood control—§ 10(f) is applicable. But once direct benefit is present, the Commission must determine an "equitable" reimbursement. And when direct benefit results from two projects, the Commission must determine what portion of the total benefit is conferred by which project.

This is not to say that the Commission has an absolutely free hand in determining what is equitable. The fact that this court is empowered to review 10(f) determinations is itself evidence of the requirement of rational determination based on articulated reasons. Permian Basin Area Rate Cases, 390 U.S. 747, 792, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968); Scenic Hudson Preservation Conference v. FPC, 354 F.2d 608 (2d Cir. 1958), cert. denied, 384 U.S. 941, 86 S. Ct. 1462, 16 L.Ed.2d 540 (1966). On the other hand, if it is clear that an agency, here the Commission, has taken a "hard look" at the issues before it, and has reached a result based on reason, it is not for the reviewing court to substitute its own judgment. See, e. g., Greater Boston TV Corp. v. FCC, 143 U.S.App. D.C. 383, 444 F.2d 841 (Nov. 13, 1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971).

Here the Commission was faced with a choice—either (1) to attribute to Alabama all of the power benefits that Weiss itself could have conferred on the three downstream plants, crediting Allatoona with only the increment or (2) to credit Allatoona with all of the gains it could confer, and assign Weiss only the increment or (3) to allocate power gains on the basis of some intermediate approach. The Commission chose the second, and gave as its reason the fact that it did not wish to permit a project, "constructed downstream and later in time to discount, cancel out or allocate to itself the benefits originally provided by upstream headwater improvements." 42 F.P.C. at 1130).

We think this choice was reasonable. Title I of the Federal Power Act,—the original Federal Water Power Act—provides a complete scheme of national regulation promoting the comprehensive development of the nation's water resources. First Iowa Hydro-Electric Cooperative v. FPC, 328 U.S. 152, 180, 66 S.Ct. 906, 90 L.Ed. 1143 (1946). Congress has long envisioned the comprehensive development of power facilities on the Alabama-Coosa River system. See note 6, *supra*. However we do not conclude, as does petitioner, that such a comprehensive plan renders irrational the "first-in-time" rule adopted by the FPC. On the contrary, we think it reasonable to conclude that the comprehensive development of power facilities is furthered if an owner's expectation regarding contributions from downstream beneficiaries may be planned with confidence, not subject to partial defeasance merely because a later-constructed project is, at times, capable of providing some of the same benefits to the downstream owners. A power company might well decide not to construct a new storage facility if its right to receive benefits could be pre-empted in whole or in part by a later-constructed project. As the Commission early noted, long before this controversy, "financial support of headwater improvements by downstream beneficiaries extends the feasible limits of such improvements in the common interest." Southern California Edison Co., 1 FPC 567, 574 (1939).

What gives weight to the Commission's approach in equitable assessment of charges is the undisputed fact that in deciding whether to issue a license permitting the construction of a hydroelectric project, the Commission looks to the *additional* benefits it can provide,—in present context, the incremental headwater benefits to downstream plants—and weighs them against aggregate costs of the project. See Alabama Power Company, 18 F.P.C. 257, 268 (1957) (issuing license for construction of Weiss project). Since the Commission deter-

mined the merit and worth of the Weiss project in terms of its incremental benefits for purposes of determining whether to approve construction and a license, it is acting consistently and reasonably in using the incremental gains as defining the Weiss benefit, and rejecting Alabama's claim that its Weiss project is providing additional benefits to downstream facilities, overlapping the benefits they receive from the Allatoona dam, for purposes of determining assessment of charges under § 10(f).

Petitioner vigorously contends that the "first-in-time" approach is vitiated by the possibility, indeed probability, of changes in the functional operations of hydroelectric projects as a river is developed and use requirements change. Petitioner refers to various changes at Allatoona itself in the allocation of project costs to the power, flood control and irrigation functions of the project. During the period 1954–56, for example, there was a decrease in the costs allocated to flood control and an increase in the allocation to power production. We fail to see how the treatment of later-constructed plants as incremental to those already in existence can in any way affect such reallocations. Reallocations according to function are certainly not prohibited under the "first-in-time" rule. With adjustments of the amount of project costs allocable to power, there will simply be a change in the amount of 10 (f) costs to be allocated, since these proceedings are concerned only with power generation.

Finally, the Commission's approach may not be faulted as an inconsistent and impermissible departure from its practice. Petitioner says the FPC has departed from its practice, in § 10(f) proceedings to allocate the benefits of a headwater improvement, of determining the extent of the benefit by comparing actual energy generation with the use of that improvement against a projection assuming the absence of the headwater improvement. As the Hearing Examiner pointed out, only one hydroelectric plant downstream from a federally constructed project was involved in South Carolina Electric & Gas Co., 29 FPC 624 (1963), aff'd South Carolina Elec. & Gas Co. v. FPC, 338 F.2d 898 (4th Cir. 1964); Virginia Electric & Power Co., 37 FPC 340, rehearing denied, 37 FPC 767 (1967). This marks a crucial fact distinction from the problem at bar since it means that both approaches are identical in result and it is not necessary to pursue any refinement in analysis. The Commission rightly considered the case at bar as one of first impression, with freedom to develop an approach that was equitable and in furtherance of sound water resource development policy.[12]

### C. *Value to Power Production At-Site*

We now turn to petitioner's other contention—that the FPC over-charged petitioner because it underestimated the value of Allatoona's joint-use facilities to the production of power at Allatoona.

■ Appellant's contention complains of the difference in treatment accorded

---

12. As to the FPC opinion on headwater benefits for the Columbia River Basin, there is no indication that the Commission addressed itself to, or was even faced with, the precise problem involved here. The Montana Power Co. 11 FPC 832 (1952); Columbia River Basin Investigation, 29 FPC 238 (1963); United Gas Pipeline 31 FPC 1044 (1964); Columbia River Basin Determination 33 FPC 300, 907 (1965); Columbia River Basin Determination 35 FPC 212, 213, 1030 (1966). The fact that the settlement among private power companies on the Columbia Basin did not follow the "first-in-time" approach, and that the FPC approved the settlement as not unreasonable, does not limit the FPC in approaching its duty under § 10(f) to make an allocation it deemed equitable. A Company may settle for less than it could have obtained from litigation. A court may approve a settlement different from what it would have ordered. These elementary principles of "settlement," as distinguished from precedential determination, have vitality for agency proceedings. See City of Chicago v. FPC, 128 U.S.App.D.C. 107, 119, 385 F.2d 629, 641 (1967).

to the joint-use facilities at the Allatoona upstream facility, the dam and the reservoir, which by definition are for other uses (flood control, recreation) as well as power, and to the "specific power facilities" at the upstream plant, i. e., the facilities that have no uses other than power, which include the power house and equipment, the power intake works, tailrace and switchyard structures and equipment. The Commission makes an allocation to power of an appropriate portion of the total cost of the joint-use facilities. The power component of the joint-use facilities is of value to the production of power at both the upstream and the downstream plant. The specific power facilities at the upstream plant have no value to the production of power downstream.

The Commission calculated value at the Allatoona plant in the same way as it calculated such value in other cases. The starting point is the simple premise that the annual value to the United States of the power produced at Allatoona is considered to be equal to the total annual cost of producing that power.[13] That total cost is the sum of (1) the annual cost of the joint-use facilities to be allocated to power site and downstream, and (2) the annual cost of the specific power facilities. Here, as in previous instances, the Commission held that the value of the joint-use facilities to the production of power at site should equal only the annual costs of the joint-use facilities allocated to power.[14] It excluded the value of the specific power facilities from the calculation. Petitioner claims error in this determination, resulting in about a 50% under-estimate of the value of Allatoona joint use facilities to on-site power production. The reason assigned by the Hearing Examiner, and adopted by the Commission on rehearing, for the exclusion of the cost of specific power facilities from this calculation, was that

"[n]o portion of the cost of [specific] power facilities has been included in the total 10(f) costs (Cp) and therefore [specific] facilities costs cannot be included in the cost which is intended to measure the benefit received by Licensee from such 10(f) costs." 42 FPC at 1158. We think there is logic to this position. In other words since all that is being allocated under 10(f) is certain specified costs of the joint-use facilities,—and there is no suggestion that any portion of the specific power facilities are of benefit to the downstream facility or to be borne as costs by the downstream facility—it is simply not necessary to take into account the cost of the specific power facilities for purposes of the 10(f) allocation.

A more extended analysis of the error in appellant's supposition is provided in the Secretary's brief (pp. 28–29) as follows:

Alabama's contention misconceives the nature of the "values" which form components of the Commission's formula. The formula does not compare the value of the additional *power* produced downstream on account of Allatoona regulation with the value of the *power* produced at the federal project; rather, the formula compares the value of the *joint use facilities* to the production of the additional power downstream with the value of the *joint use facilities* to the production of power at the federal project. The joint use facilities are of value downstream because they allow the downstream projects to produce additional power at a substantially lower incremental cost than the incremental costs which would have been incurred had the power been produced by an alternate steam-electric source. The "value" downstream is actually the savings in power generation costs realized, measured by the difference in the two in-

13. South Carolina Electric & Gas Co. v. F.P.C., *supra*.

14. These joint use facilities costs are slightly higher than the 10(f) costs as

they include operating, interim replacement and insurance costs in addition to the interest, maintenance and depreciation charges to be apportioned under Section 10(f).

cremental costs. The joint use facilities are of value to the federal Allatoona project in that they contribute, together with the specific power facilities, towards the production of power at the federal project. As the total value of the power produced at Allatoona is equivalent to the costs of both the joint use and the specific facilities, the "value" at site of the joint use facilities towards the production of federal power is equal to the costs of the joint use facilities—the measuring rod used by the Commission.

The value of the joint-use facilities to Allatoona power production cannot be measured in the same way as value to downstream site. In arriving at some other means for calculating the contribution of the joint-use facilities to the total value of power generated at Allatoona, the Commission used the basic conception that value equals costs for a federal facility.[15] The specific power facilities, representing an additional cost to the value of power, also contribute to the value of power generated at Allatoona, but that component of the power value is analytically separable from the contribution made by the joint-use facilities to the value of power at-site. This power value of the joint-use facilities was properly determined on the basis of the cost of the joint-use facilities, without any adjustment based on the cost of the analytically separable specific power facilities.

In the *South Carolina* case the court accepted as a reasonable exercise of discretion an approach which determined the power value of the upstream joint-use facilities (a) at the downstream plant by comparison with alternative of steam generation, and (b) at the upstream plant by reference to the cost of joint-use facilities.[16]

As appears from its discussion 338 F.2d at 905, the court rejected the contention that these two concepts "are unrelated and so should not be intermixed" in apportioning the 10(f) costs, and concurred in the FPC's approach that in each instance it was measuring the value in dollars at each plant site of the service available from the upstream joint-use facilities. The court upheld that approach even though it specifically recognized that the units of value "do lack fungibility."

It might be helpful to suggest an analogy, hopefully not inept, to a case where a computation must be based on relative value of two land parcels. As to one, a general purpose property, market prices of comparable properties are readily available and are the primary means of ascertaining value; as to the other, a special purpose property, no such market prices are available and value is calculated by other techniques, such as reproduction cost less depreciation. We suggest there would be comparable values, for purposes, of, say, a swap, or allocation of benefits or burdens, even though different techniques of measuring value were used for the different parcels.

We realize that petitioner's exact contention has not been raised before, and cannot be held settled by precise authority. But we think the basic principle has been settled—that it is reasonable to make an allocation based on value of the joint-use facilities to two sites even though different methods are used as to the different sites, so long as there is a reason for this; the agency is not

15. This conception was specifically approved in South Carolina Electric & Gas Co. v. F.P.C., 338 F.2d 898, 905 (4th Cir. 1964).

16. See 29 FPC at 629: "The power benefits to Stevens Creek [company downstream plant] consist of the monetary value of its energy gains; the power benefits to Clark Hill [upstream Federal plant] consist of the monetary cost (because Clark Hill power is sold at cost) of producing at-site power attributable to the joint-use facilities. The cost of the latter power was determined residually by determining the total annual cost of Clark Hill allocated to power, and by subtracting therefrom the annual cost of the specified power facilities."

required in pursuit of formal consistency to abandon sensible means of ascertaining power values of the joint-use facilities at each site, and to engage in hypothetical, abstract or arid calculations even though put forward with an aura of persuasiveness.[17]

It may be that the agency could have acted differently. But the question for the court is whether it has acted unreasonably or irrationally, and that cannot be said of the point brought before us on appeal.

Affirmed.

17. In the reply brief petitioner argues that omitting specific power facilities at the upstream plant cannot be justified consistently with a failure to deduct petitioner's own investment in dams and specific power facilities from the value of the joint-use facilities to its downstream plants, since the "only benefit received by Alabama from Allatoona * * is the storage and release of water."

In comparing two alternatives as add-ons to Alabama's existing power facilities the need is for comparison of Alabama's total costs with each alternative, and removal of the cost of Alabama's generational facilities would render meaningless any calculation of value at the downstream facility.

Appellant cannot be taken as seriously suggesting exclusion of the cost of the generating equipment etc. downstream.

But the fact that, say, the generating equipment cost must be calculated downstream in order to make the comparison with alternative (steam) facilities meaningful does not mean that it must or should be calculated upstream where it is neither necessary, nor helpful, to arrive at a calculation of the value of joint-use facilities based on cost of the joint-use facilities.

\* \* \* \* \*

At times petitioner seems to lay stress on the fact that Allatoona would not be able to generate any energy if the dam and reservoir were not present.

Elementary principles indicate that where different elements are conjoined in an enterprise they are each and all indispensable, yet costing and allocation techniques permit assignment of values to each part.