[Cite as *State v. Sherfey*, 2014-Ohio-1717.]

COURT OF APPEALS
FAIRFIELD COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|                          |   |                              |
|--------------------------|---|------------------------------|
|                          |   | JUDGES:                      |
| STATE OF OHIO            | : | Hon. W. Scott Gwin, P.J.     |
|                          | : | Hon. John W. Wise, J.        |
| Plaintiff-Appellee       | : | Hon. Patricia A. Delaney, J. |
|                          | : |                              |
| -vs-                     | : |                              |
|                          | : | Case No. 13-CA-37            |
| TODD N. SHERFEY          | : |                              |
|                          | : |                              |
| Defendant-Appellant      | : | O P I N I O N                |


CHARACTER OF PROCEEDING:    Criminal appeal from the Fairfield County
                            Court of Common Pleas, Case No. 2012-
                            CR-388


JUDGMENT:                   Affirmed


DATE OF JUDGMENT ENTRY:     April 21, 2014


APPEARANCES:

For Plaintiff-Appellee              For Defendant-Appellant

DARREN L. MEADE                     SCOTT P. WOOD
Fairfield County Prosecutor's Office  144 East Main Street
239 West Main Street, Suite 101     P.O. Box 667
Lancaster, OH  43130                Lancaster, OH  43130

*Gwin, P.J.*

{¶1} Appellant Todd N. Sherfey ["Sherfey"] appeals his conviction and sentence for one count of receiving stolen property a felony of the fifth degree in violation of R.C. 2913.51 following a jury trial in the Fairfield County Court of Common Pleas.

## *Facts and Procedural History*

{¶2} Sherfey was a business owner in Lancaster, Fairfield County, Ohio, operating a precious metals brokerage. In addition to buying and selling precious metals, Sherfey also bought and sold gift cards. With regard to both precious metals and gift cards, Sherfey would profit by buying low and selling high. Typically, Sherfey would sell the gift cards to an Internet clearinghouse. Although there are no governmental regulations regarding the buying and selling of gift cards, Sherfey applied the regulations and documentation relating to the buying and selling of precious metals to the buying and selling of gift cards, including documenting personal information regarding the seller and photocopying governmental identification, usually a driver's license, and providing that information to law enforcement.

{¶3} T.J. Maxx, a retail chain store, through its loss prevention department, discovered that there were a number of individuals who were running a theft ring. These individuals would steal merchandise and other individuals would exchange the merchandise for gift cards. The gift cards would be sold or traded for illegal drugs. When a number of individuals involved in the theft ring were apprehended by law enforcement, one member of the theft ring, Shane Stoughton, in exchange for immunity from prosecution, implicated Sherfey. Stoughton claimed that Sherfey knew the gift

cards were generated from stolen property and that he purchased the gift cards for cash. Stoughton agreed to cooperate with police to obtain incriminating information about Sherfey during a sting operation police conducted on December 30, 2011.

**1. Events Leading up to the Sting Operation.**

{¶4} Prior to the sting operation, Lt. Shane Wilson of the Lancaster Police Department talked to Sherfey about concerns that Stoughton was involved in a theft ring that illegally obtained gift cards from various stores, including T.J. Maxx, that Stoughton then sold to Sherfey. The participants in the theft ring sold approximately $15,000 worth of gift cards at Sherfey's store in 2011. In the three months leading up to the sting operation on December 30, 2011, Stoughton made 15 transactions involving gift cards at Sherfey's business. Stoughton sold $4,500 worth of gift card at Sherfey's business as a result of these transactions.

{¶5} T.J. Maxx conducted its own internal investigation. This investigation uncovered the theft ring. Company investigator Andrew Holloway conducted surveillance in which he observed Stoughton and his associates conducting the activity at the Lancaster T.J. Maxx store. The investigation revealed that Stoughton and the other participants would then go to Sherfey's store apparently to sell the gift cards. Holloway determined that between September and December 2011, T.J. Maxx lost approximately $14,000 as a result of thefts. Holloway made contact with the Lancaster Police Department. On December 29, 2011, officers apprehended persons involved in the theft ring, including Stoughton.

{¶6} Though Sherfey was not always the person Stoughton conducted the transactions with, Sherfey did on occasion conduct business with Stoughton. Sherfey

was "right there" "almost all of the time" and would almost always be involved in the transactions by discussing with his wife (who worked at the store) what percentage of the face value of the gift cards they would pay Stoughton, counting out cash, or calling in cards to a 1-800 number to verify the amount of the cards. In addition to the transactions at his store, Sherfey met Stoughton or his cohorts a couple of times at a nearby parking lot to exchange gift cards for cash, with the dollar amount being approximately $200-$300. Sherfey would engage in suspicious activity when the theft ring participants would sell gift cards at his store. For example, he would direct the sellers to remove the batteries from their cell phones and place them in a refrigerator in the store, go to a back room to discuss matters, and turn the volume on a radio up louder apparently to avoid detection.

{¶7}    Stoughton would use terms commonly understood to relate to theft to explain how he had obtained the gift cards, such as "hit a lick, hustled up some cards." Sherfey considered Stoughton to be a friend. Sherfey implored Stoughton to "get legit." He further advised Stoughton to get help for Stoughton's heroin addiction.

{¶8}    Approximately two days before the sting operation, Sherfey told Stoughton that Stoughton was on a "do not buy" list kept by the Lancaster Police Department. The following day, Sherfey told Stoughton that if Stoughton wanted to sell gift cards to him Stoughton "would have to bring somebody else in to do it."

**2. The Sting Operation**

{¶9}    After the Lancaster Police Department apprehended Stoughton on December 29, 2011, Stoughton agreed to cooperate with the police as a confidential informant to gather incriminating information about Sherfey. On December 30, 2011,

after initial police protocols to ensure the operation was controlled, Stoughton went to Sherfey's store with a gift card T.J. Maxx created and the police gave him. There, he talked with Sherfey in a back room after Sherfey turned up the volume on a radio. Sherfey told Stoughton he could not buy gift cards from Stoughton, and that Stoughton could figure out what to do. Sherfey then loaned Stoughton $170, stating to Stoughton, "I can loan you money. It "don't matter if I know what you do. I'm just a man loaning you money. There's nothing illegal about that."

{¶10} After his initial contact with Sherfey, Stoughton met with police. Karlee Cumbo, one of the other participants in the theft ring, also agreed to cooperate with police. The police and Stoughton placed a recorded call to Sherfey. Stoughton told Sherfey he had "hustled up some more cards" and wanted to know if Sherfey would buy them. Sherfey stated he could not buy the cards from Stoughton, but he would be able to buy cards "from people" that day. Stoughton told Sherfey that he and his girlfriend would be there shortly.

{¶11} The police issued Stoughton three gift cards purporting to be from T.J. Maxx and valued at more than $1,000. Stoughton walked with Cumbo into Sherfey's store with the cards in his hand. Sherfey stated he could not buy the cards from Stoughton. Stoughton then handed the cards to Cumbo. Sherfey directed Stoughton outside, saying "Let's go talk."

{¶12} While outside, Sherfey made statements that indicated his knowledge of the illegal nature of the cards Stoughton was selling and had been selling. Sherfey told Stoughton he would prefer it if Stoughton would "send in" another person rather than bringing the other person inside the business. Sherfey had previously told Stoughton

that Stoughton was on a "do not buy" list he believed the Lancaster Police Department was keeping. While outside the store, Sherfey talked about how his business associate advised him not to buy gift cards from people on the list. At that point, Stoughton indicated to Sherfey that was the reason he brought Cumbo. Sherfey and Stoughton also discussed T.J. Maxx becoming aware of the fraudulent gift card activity. Sherfey told Stoughton if he did not stop, Stoughton was "going to get caught."

{¶13} Sherfey explained that as a result of the police and T.J. Maxx becoming aware of the fraudulent gift card activity, he was lowering the amount he would pay for T.J. Maxx cards as opposed to gift cards from other stores. This was Sherfey's attempt to dissuade people from selling the cards to him. Stoughton also talked to Sherfey about Stoughton's addiction to illegal drugs and how that was causing him to engage in "illegal" activity. Cumbo sold the gift cards to Sherfey's wife inside the business while Sherfey and Stoughton talked outside. Sherfey's wife Olga Sherfey, worked at the business. Olga documented the transaction as with any other gift card transaction. After Olga purchased the gift cards from Cumbo, she put them in the business drawer.

{¶14} Immediately after the transaction, law enforcement entered the store, seized the cards from the business drawer where Olga had placed them and arrested Sherfey and charged him with receiving stolen property.

{¶15} On August 24, 2012, Sherfey was indicted with two counts of receiving stolen property in violation of R.C. 2913.51. In Count 1 of the Indictment, the state alleged that the theft offense involved property listed in R.C. 2913.71 and, therefore, was a felony of the fifth degree. In Count 2 of the Indictment, the state alleged that the

value of the property involved was $1,000 or more, making the offense a felony of the fifth degree.

{¶16} Prior to the beginning of the jury trial, the state dismissed Count 1 of the Indictment and the trial proceeded on Count 2 only (referenced throughout the trial as Count A). After the presentation of evidence and deliberations, the jury returned a verdict of guilty to receiving stolen property and additionally found that the value of the property exceeded $1,000.

{¶17} On April 15, 2013, Sherfey was sentenced to 11 months in a state penal institution, suspended for 3 years of community control, with the condition that he serve 30 days in the Fairfield County Jail.

### Assignments of Error

{¶18} Sherfey has raised two assignments of error,

{¶19} "I. THERE WAS INSUFFICIENT EVIDENCE TO CONVICT SHERFEY OF RECEIVING STOLEN PROPERTY AS A FELONY OF THE FIFTH DEGREE AND THE JURY'S VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶20} "II. THE TRIAL COURT ERRED BY INSTRUCTING THE JURY ON THE INCORRECT DEFINITION OF VALUE, ENHANCING THE OFFENSE TO A FELONY OF THE FIFTH DEGREE."

### I.

{¶21} Sherfey contends that his conviction is against the manifest weight of the evidence.

{¶22} Our review of the constitutional sufficiency of evidence to support a criminal conviction is governed by *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct.

2781, 61 L.Ed.2d 560 (1979), which requires a court of appeals to determine whether "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id.; see also *McDaniel v. Brown*, 558 U.S. 120, 130 S.Ct. 665, 673, 175 L.Ed.2d 582(2010) (reaffirming this standard); *State v. Fry*, 125 Ohio St.3d 163, 926 N.E.2d 1239, 2010–Ohio–1017, ¶146; *State v. Clay*, 187 Ohio App.3d 633, 933 N.E.2d 296, 2010–Ohio–2720, ¶68.

**{¶23}** Weight of the evidence addresses the evidence's effect of inducing belief. *State v. Thompkins*, 78 Ohio St.3d 380, 386-387, 678 N.E.2d 541 (1997), *superseded by constitutional amendment on other grounds as stated by State v. Smith,* 80 Ohio St.3d 89, 684 N.E.2d 668, 1997-Ohio–355. Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue, which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief." (Emphasis sic.) Id. at 387, 678 N.E.2d 541, quoting Black's Law Dictionary (6th Ed. 1990) at 1594.

**{¶24}** When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a "'thirteenth juror'" and disagrees with the fact finder's resolution of the conflicting testimony. Id. at 387, 678 N.E.2d 541, quoting *Tibbs v. Florida*, 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). However, an appellate court may not merely

substitute its view for that of the jury, but must find that "'the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins*, supra, 78 Ohio St.3d at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717, 720–721(1st Dist. 1983). Accordingly, reversal on manifest weight grounds is reserved for "'the exceptional case in which the evidence weighs heavily against the conviction.'" Id.

> "[I]n determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts.
>
> * * *
>
> "If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment."

*Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 60, at 191–192 (1978).

{¶25} In the case at bar, Sherfey argues that the evidence presented at trial fails to prove that he was a party to the transaction that sold the gift cards; the evidence failed to prove that Sherfey ever possessed the sting gift cards, either actually or constructively; and the evidence failed to show that the sting gift cards were explicitly represented to be stolen.

{¶26} In the case at bar, the transaction took place at the business owned by Sherfey. Sherfey's wife participated in the exchange of the gift cards while Sherfey and Stoughton talked outside the store. Prior to the exchange Stoughton telephoned Sherfey and told him that he, Stoughton had some more cards. (2T. at 374-375; State's Exhibit T). Sherfey replied that he could not buy cards from Stoughton. (Id.) Stoughton responded that they were not from him they were from his girlfriend and she was coming in. (Id.) Sherfey responded that he had money and he could buy cards from people that day. (Id.) Stoughton told Sherfey that he and his girl would be in just a little bit, fifteen to twenty minutes. (Id.)

{¶27} Stoughton testifed that he had the gift cards in his hand when he and Karlee entered Sherfey's establishment. (2T. at 377; 379). Sherfey told Stoughton that he could not buy from him. (Id.; State's Exhibit T) Stoughton then handed the gift cards to Karlee and told Sherfey "I'm not selling them, she is." (2T. at 379; State's Exhibit T) At that point Sherfey tells Stoughton, "come talk to me." (State's Exhibit T) The pair then left the store. Sherfey tells Stoughton while outside the he cannot buy from him. Stoughton tells Sherfey "that's why I brought – you know what I' saying." (State's Exhibit T) Sherfey responses "I do, I do, absolutely." (T. at 386; State's Exhibit T.) Also during this conversation Sherfey tells Stoughton "don't bring her in, send her in." (T. at 382; State's Exhibit T.)

{¶28} During the conversation that took place outside the store, Stoughton told Sherfey "doing the return game is about done" because T.J. Maxx is "getting hip." (State's Exhibit T) Sherfey responded that eventually Stoughton is going to be caught and that he should not do it anymore. (Id.). He further told Stoughton that Stoughton has

helped him pay his mortgage for the past few months. (Id.). When Sherfey tells Stoughton that he now is only paying 30% for T.J. Maxx gift cars, Stoughton responds, "That's my easiest hustle. They got lack security and a no hassle return policy." (Id.).

{¶29} Karlee came out to tell Stoughton that they were only paying 30% on the T.J. Maxx gift cards Sherfey, Stoughton, and Karlee then go inside the business where Stoughton asks Sherfey if that is all they are going to do now. Sherfey replies, "Remember what we were talking about." (Id.) Karlee handed Stoughton the cash while inside the store in the presence of Sherfey (T. at 381:389)

{¶30} Sherfey was convicted of receiving stolen property. R.C. 2913.51 states, in part,

(A) No person shall receive, retain, or dispose of property of another knowing or having reasonable cause to believe that the property has been obtained through commission of a theft offense.

{¶31} R.C. 2901.22 defines "knowingly" as follows:

(B) A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist.

{¶32} Whether a person acts knowingly can only be determined, absent a defendant's admission, from all the surrounding facts and circumstances, including the doing of the act itself." (Footnotes omitted). *State v. Huff*, 145 Ohio App.3d 555, 563, 763 N.E.2d 695(1st Dist. 2001). Thus, "[t]he test for whether a defendant acted knowingly is a subjective one, but it is decided on objective criteria." *State v. McDaniel*,

2nd Dist. Montgomery No. 16221, 1998 WL 214606 (May 1, 1998) (citing *State v. Elliott*, 104 Ohio App.3d 812, 663 N.E.2d 412(10th Dist. 1995)).

**{¶33}** R.C. 2925.01(K) defines possession as follows: " 'Possess' or 'possession' means having control over a thing or substance, but may not be inferred solely from mere access to the thing or substance through ownership or occupation of the premises upon which the thing or substance is found." R.C. 2901.21 provides the requirements for criminal liability and provides that possession is a "voluntary act if the possessor knowingly procured or received the thing possessed, or was aware of the possessor's control of the thing possessed for sufficient time to have ended possession." R.C. 2901.21(D)(1).

**{¶34}** Possession may be actual or constructive. *State v. Butler*, 42 Ohio St.3d 174, 176, 538 N.E.2d 98(1989); *State v. Haynes*, 25 Ohio St.2d 264, 267 N.E.2d 787(1971); *State v. Hankerson*, 70 Ohio St.2d 87, 434 N.E.2d 1362(1982), syllabus. To establish constructive possession, the evidence must prove that the defendant was able to exercise dominion and control over the contraband. *State v. Wolery*, 46 Ohio St.2d 316, 332, 348 N.E.2d 351(1976). Dominion and control may be proven by circumstantial evidence alone. *State v. Trembly*, 137 Ohio App.3d 134, 738 N.E.2d 93(8th Dist. 2000). Circumstantial evidence that the defendant was located in very close proximity to the contraband may show constructive possession. *State v. Butler*, supra; *State v. Barr*, 86 Ohio App.3d 227, 235, 620 N.E.2d 242, 247-248(8th Dist. 1993); *State v. Morales*, 5th Dist. Licking No. 2004 CA 68, 2005-Ohio-4714, ¶50; *State v. Moses,* 5th Dist. Stark No. 2003CA00384, 2004-Ohio-4943,¶9. Ownership of the contraband need not be established in order to find constructive possession. *State v. Smith*, 9th Dist. Summit

No. 20885, 2002-Ohio-3034, ¶13, *citing State v. Mann*, (1993) 93 Ohio App.3d 301, 308, 638 N.E.2d 585(8th Dist. 1993). Furthermore, possession may be individual or joint. *Wolery*, 46 Ohio St.2d at 332, 348 N.E.2d 351. Multiple individuals may constructively possess a particular item of contraband simultaneously. *State v. Pitts*, 4th Dist. Scioto No. 99 CA 2675, 2000-Ohio-1986. The Supreme Court has held that knowledge of illegal goods on one's property is sufficient to show constructive possession. *State v. Hankerson*, 70 Ohio St.2d 87, 91, 434 N.E.2d 1362, 1365(1982), certiorari denied, 459 U.S. 870, 103 S.Ct. 155, 74 L.Ed.2d 130(1982).

{¶35} If the state relies on circumstantial evidence to prove an essential element of an offense, it is not necessary for "such evidence to be irreconcilable with any reasonable theory of innocence in order to support a conviction." *State v. Jenks*, 61 Ohio St.3d 259, 272, 574 N.E. 2d 492(1991), paragraph one of the syllabus, *superseded by State constitutional amendment on other grounds as stated in State v. Smith*, *80 Ohio St.3d 89, 684 N.E.2d 668(1997).* "Circumstantial evidence and direct evidence inherently possess the same probative value [.]" *Jenks*, 61 Ohio St.3d at paragraph one of the syllabus. Furthermore, "[s]ince circumstantial evidence and direct evidence are indistinguishable so far as the jury's fact-finding function is concerned, all that is required of the jury is that i[t] weigh all of the evidence, direct and circumstantial, against the standard of proof beyond a reasonable doubt." *Jenks*, 61 Ohio St.3d at 272, 574 N.E. 2d 492. While inferences cannot be based on inferences, a number of conclusions can result from the same set of facts. *State v. Lott*, 51 Ohio St.3d 160, 168, 555 N.E.2d 293(1990), citing *Hurt v. Charles J. Rogers Transp. Co*, 164 Ohio St. 329, 331, 130 N.E.2d 820(1955). Moreover, a series of facts and circumstances can be

employed by a jury as the basis for its ultimate conclusions in a case. *Lott,* 51 Ohio St.3d at 168, 555 N.E.2d 293, citing *Hurt,* 164 Ohio St. at 331, 130 N.E.2d 820.

**{¶36}** Viewing the evidence in a light most favorable to the prosecution, we conclude that a reasonable person could have found beyond a reasonable doubt that Sherfey committed the crime of receiving stolen property. We hold, therefore, that the state met its burden of production regarding each element of the crime of receiving stolen property and, accordingly, there was sufficient evidence to support Sherfey's conviction for receiving stolen property.

**{¶37}** As an appellate court, we are not fact finders; we neither weigh the evidence nor judge the credibility of witnesses. Our role is to determine whether there is relevant, competent and credible evidence upon which the fact finder could base his or her judgment. *Cross Truck v. Jeffries*, 5th Dist. No. CA–5758, 1982 WL 2911(Feb. 10, 1982). Accordingly, judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed as being against the manifest weight of the evidence. *C.E. Morris Co. v. Foley Construction*, 54 Ohio St.2d 279, 376 N.E.2d 578(1978). The Ohio Supreme Court has emphasized: "'[I]n determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts. * * *.'" *Eastley v. Volkman*, 132 Ohio St.3d 328, 334, 972 N.E. 2d 517, 2012-Ohio-2179, *quoting Seasons Coal Co., Inc. v. Cleveland,* 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 603, at 191–192 (1978). Furthermore, it is well established that the trial court is in the best position to determine the credibility of

witnesses. See, e.g., *In re Brown*, 9th Dist. No. 21004, 2002–Ohio–3405, ¶ 9, citing *State v. DeHass*, 10 Ohio St .2d 230, 227 N.E.2d 212(1967).

**{¶38}** Ultimately, "the reviewing court must determine whether the appellant or the appellee provided the more believable evidence, but must not completely substitute its judgment for that of the original trier of fact 'unless it is patently apparent that the fact finder lost its way.'" *State v. Pallai*, 7th Dist. Mahoning No. 07 MA 198, 2008-Ohio-6635, ¶31, *quoting State v. Woullard*, 158 Ohio App.3d 31, 2004-Ohio-3395, 813 N.E.2d 964 (2nd Dist. 2004), ¶ 81. In other words, "[w]hen there exist two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, it is not our province to choose which one we believe." *State v. Dyke*, 7th Dist. Mahoning No. 99 CA 149, 2002-Ohio-1152, at ¶ 13, *citing State v. Gore*, 131 Ohio App.3d 197, 201, 722 N.E.2d 125(7th Dist. 1999).

**{¶39}** The weight to be given to the evidence and the credibility of the witnesses are issues for the trier of fact. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212(1967), paragraph one of the syllabus; *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶118. *Accord, Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *Marshall v. Lonberger*, 459 U.S. 422, 434, 103 S.Ct. 843, 74 L.Ed.2d 646 (1983).

**{¶40}** The jury as the trier of fact was free to accept or reject any and all of the evidence offered by the parties and assess the witness's credibility. "While the jury may take note of the inconsistencies and resolve or discount them accordingly * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence." *State v. Craig*, 10th Dist. Franklin No. 99AP-739, 1999 WL

29752 (Mar 23, 2000) *citing State v. Nivens*, 10th Dist. Franklin No. 95APA09-1236, 1996 WL 284714 (May 28, 1996). Indeed, the jury need not believe all of a witness' testimony, but may accept only portions of it as true. *State v. Raver*, 10th Dist. Franklin No. 02AP-604, 2003-Ohio-958, ¶21, *citing State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964); *State v. Burke*, 10th Dist. Franklin No. 02AP-1238, 2003-Ohio-2889, *citing State v. Caldwell*, 79 Ohio App.3d 667, 607 N.E.2d 1096 (4th Dist. 1992). Although the evidence may have been circumstantial, we note that circumstantial evidence has the same probative value as direct evidence. *State v. Jenks*, supra.

**{¶41}** We find that this is not an "'exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541, *quoting Martin*, 20 Ohio App.3d at 175, 485 N.E.2d 717. The jury neither lost his way nor created a miscarriage of justice in convicting Sherfey of the charges.

**{¶42}** Based upon the foregoing and the entire record in this matter, we find Sherfey's convictions were not against the sufficiency or the manifest weight of the evidence. To the contrary, the jury appears to have fairly and impartially decided the matters before them. The jury as a trier of fact can reach different conclusions concerning the credibility of the testimony of the state's witnesses. This court will not disturb the jury's finding so long as competent evidence was present to support it. *State v. Walke*r, 55 Ohio St.2d 208, 378 N.E.2d 1049 (1978). The jury heard the witnesses, evaluated the evidence, and was convinced of Sherfey's guilt.

**{¶43}** Finally, upon careful consideration of the record in its entirety, we find that there is substantial evidence presented which if believed, proves all the elements of the crime beyond a reasonable doubt.

**{¶44}** Sherfey first assignment of error is overruled.

II.

**{¶45}** In the case at bar, value enhanced the offense from a first-degree misdemeanor to a felony of the fifth degree. In his second assignment of error, Sherfey contends that the trial judge erred by not instructing the jury that the definition of "value" was fair market value, pursuant to R.C. 2913.61(D)(3), or, in the alternative, the trial court should have used the definition of value under R.C. 2913.61(E)(5).

**{¶46}** The trial court, over objection by Sherfey, instructed the jury on value, pursuant to R.C. 2913.61(E)(6) as follows:

> When the property involved is an instrument entitling the holder or bearer to receive property, the face value, or, if there is no face value, the value of the property that may be received by the instrument is *prima facie* evidence of the value of the instrument. (5T. at 922).

**{¶47}** Sherfey objected to this instruction and requested the trial court to instruct the jury that the appropriate definition of value was fair market value, pursuant to R.C. 2913.61(D)(3), or, in the alternative, the trial court should have used the definition of value under R.C. 2913.61(E)(5). (5 T. at 941-943).

**{¶48}** R.C. 2913.61(D) provides,

> (3) The value of any real or personal property that is not covered under division (D)(1) or (2) of this section, and the value of services, is the fair market value of the property or services. As used in this section, "fair market value" is the money consideration that a buyer would give and a seller would accept for property or services, assuming that the buyer is

willing to buy and the seller is willing to sell, that both are fully informed as to all facts material to the transaction, and that neither is under any compulsion to act.

{¶49} R.C. 2913.61(E)(5) states,

(E) Without limitation on the evidence that may be used to establish the value of property or services involved in a theft offense:

* * *

(5) When the property involved is a warehouse receipt, bill of lading, pawn ticket, claim check, or other instrument entitling the holder or bearer to receive property, the face value or, if there is no face value, the value of the property covered by the instrument less any payment necessary to receive the property is prima-facie evidence of the value of the instrument.

{¶50} The giving of jury instructions is within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. *State v. Martens*, 90 Ohio App.3d 338, 629 N.E.2d 462 (3rd Dist.1993). In order to find an abuse of that discretion, we must determine the trial court's decision was unreasonable, arbitrary or unconscionable and not merely an error of law or judgment. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 450 N.E.2d 1140(1983). Jury instructions must be reviewed as a whole. *State v. Coleman*, 37 Ohio St.3d 286, 525 N.E.2d 792(1988).

{¶51} "Error in refusing to give a special request to charge before argument must be prejudicial in order to support reversal of a judgment rendered against a party complaining of such error." *Smith v. Flesher*, 12 Ohio St.2d 107, 233 N.E.2d 137(1967),

syllabus. It is well established that the trial court will not instruct the jury where there is no evidence to support an issue. *Riley v. Cincinnati*, 46 Ohio St.2d 287, 348 N.E.2d 135(1976). "In reviewing a record to ascertain the presence of sufficient evidence to support the giving of a[n] * * * instruction, an appellate court should determine whether the record contains evidence from which reasonable minds might reach the conclusion sought by the instruction." *Murphy v. Carrollton Mfg. Co.*, 61 Ohio St.3d 585, 591, 575 N.E.2d 828, 832 (1991).

{¶52} R.C. 2913.61(D). That section provides:

The following criteria shall be used in determining the value of property or services involved in a theft offense:

(1) The value of an heirloom, memento, collector's item, antique, museum piece, manuscript, document, record, or other thing which has intrinsic worth to its owner and which is either irreplaceable or is replaceable only on the expenditure of substantial time, effort, or money, is the amount which would compensate the owner for its loss.

(2) The value of personal effects and household goods, and of materials, supplies, equipment, and fixtures used in the profession, business, trade, occupation, or avocation of its owner, which property is not covered under division (D)(1) of this section, and which retains substantial utility for its purpose regardless of its age or condition, is the cost of replacing such property with new property of like kind and quality.

(3) The value of any property, real or personal, not covered under division (D)(1) or (2) of this section, and the value of services, is the fair

market value of such property or services. As used in this section, 'fair market value' is the money consideration which a buyer would give and a seller would accept for property or services, assuming that the buyer is willing to buy and the seller is willing to sell, that both are fully informed as to all facts material to the transaction, and that neither is under any compulsion to act.

**{¶53}** The Ohio Supreme court has reviewed R.C. 2913.61(D) and concluded,

There are three methods for valuing property under this section, which correspond to three different descriptions, or classifications of property. In order to value an item in any given case the logical approach is to compare it in successive order with each of the descriptions. When the description which matches it is reached, the corresponding method of valuation should be used.

*State v. Chaney*, 11 Ohio St.3d 208, 210, 465 N.E.2d 53.(1984). The Court further cautioned not more than one division may apply to any particular item. 11 Ohio St.3d at 255,465 N.E.2d 53.

**{¶54}** Division (D)(1) pertains to heirlooms and other items of intrinsic or unusual worth. It is readily apparent that the gift cards in the case at bar do not meet these qualifications.

**{¶55}** Division (D)(2) covers personal effects, household goods, and material, supplies, equipment and fixtures used in the profession, business, trade, occupation or avocation of the owner. Such property must not have been covered under division (D)(1) and must be of a kind which retains substantial utility for its age and condition.

The corresponding method of valuation is the cost of replacing the items with new ones of like kind and quality. The gift cards in the case at bar do not meet this definition.

{¶56} Division (D)(3) is the catchall provision. *Chaney*, 11 Ohio St.3d at 210, 465 N.E.2d 53. The corresponding method of valuation is the fair market value of such property. As used in this section, "'fair market value' is the money consideration which a buyer would give and a seller would accept for property or services, assuming that the buyer is willing to buy and the seller is willing to sell, that both are fully informed as to all facts material to the transaction, and that neither is under any compulsion to act." Sherfey argues first that the trial court should have instructed the jury that fair market value is the correct valuation method. In the alternative Sherfey contends that under R.C. 2913.16(E)(5) the value of the gift cards would be the face value of $1,162.48 less the $348.00 he paid Stoughton for the gift cards. Sherfey argues under either definition, the "value" would be less than the $1,000.00 needed to elevate the crime to a felony offense.

{¶57} Although the evidence established that Sherfey paid 30% of the face value of the cards to Stoughton, there is no evidence as to the amount Sherfey received for the stolen gift cards. Nor does Sherfey point to any evidence in the record to establish the price that a willing buyer would pay in the secondary gift card market.

{¶58} We do not subtract the cost of pulling off the caper when we calculate the value of stolen property. The general test for determining the market value of stolen property is the price a willing buyer would pay a willing seller at the time and place the property was stolen.

**{¶59}** In this case, there is no buyer, only a fence and there is no seller, only a thief, so there is no way to determine what someone would have actually paid for the gift cards in good faith. *Cf. State v. Reese*, 165 Ohio App.3d 21, 2005-Ohio-7075, 844 N.E.2d 873(7th Dist. 2005), ¶30.

**{¶60}** The gift cards in this case were shown to have a face value the aggregate of which exceeded $1,000.00. That is persuasive evidence of the potential value. *United States v. Perry*, 638 F.2d 862, 865 (5th Cir.1981). When merchandise is stolen from a merchant, market value is the sales price the merchant would have obtained for the merchandise. *United States v. Cummings*, 798 F.2d 413, 416(10th Cir. 1986); *United States v. Robinson*, 687 F.2d 359, 360(11th Cir. 1982). Thus, where the victim is a retail merchant, the market value is the retail sales price. *United States v. Wasz*, 450 F.2d 720, 727-728(7th Cir. 2006); *Cave v. United States*, 390 F.2d 58, 67 (8th Cir.1968), *cert. denied,* 392 U.S. 906, 88 S.Ct. 2059, 20 L.Ed.2d 1365 (1968).

**{¶61}** In the case at bar, an individual possessing a gift card could take that card to the retailer and redeem it for the full face value of the card. The retailer would then lose cash or merchandise equal to the face value of the gift card.

**{¶62}** The trial court's instruction on "value" did not prejudice Sherfey because there was no evidence to support Sherfey's requested instructions.

**{¶63}** Sherfey's second assignment of error is overruled.

{¶64} The judgment of the Court of Common Pleas, Fairfield County, Ohio is affirmed.

By Gwin, P.J.,

Wise, J., and

Delaney, J., concur